## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. James B. Clark III |
| v. | Mag. No. 14-3105 |
| BRIAN KAPALIN,<br>  a/k/a "Unc,"<br>MUHAMMAD SUBPUNALLAH,<br>  a/k/a "Mu," and<br>VLADIMIR SAUZERESETEO | **CRIMINAL COMPLAINT** |

I, Karen Veltri, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Karen Veltri
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence
on the 27th day of May, 2014
at Newark, New Jersey

HONORABLE JAMES B. CLARK III
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

### (Conspiracy to Provide, Obtain and Possess Contraband in a Correctional Facility)

From in or about September 2013 to in or about February 2014, in Essex County, in the District of New Jersey, and elsewhere, defendants

BRIAN KAPALIN, a/k/a "Unc,"
MUHAMMAD SUBPUNALLAH, a/k/a "Mu," and
VLADIMIR SAUZERESETEO

and others did knowingly and intentionally conspire to commit an offense against the United States, namely providing prohibited objects to an inmate of a prison, including marijuana and tobacco, and an inmate of a prison obtaining and possessing such prohibited objects, contrary to Title 18, United States Code, Sections 1791(a) and (d)(1)(B), and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

# ATTACHMENT B

I, Karen Veltri, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein based upon my own participation in this investigation, interviews and briefings with other law enforcement officers and interviews and briefings with confidential sources of information and witnesses. I also have reviewed publicly-available documents and reports, and other evidence, including pen registers, surveillance, consensual recordings, and recorded jail calls. Because this complaint is being submitted for the limited purpose of establishing probable cause, I have not set forth herein each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. All referenced times are approximate and refer to Eastern Standard Time. Unless otherwise indicated, statements attributable to individuals are related in substance and in part.

1. At times relevant to this complaint:

    a. Defendant BRIAN KAPALIN, a/k/a "Unc," ("KAPALIN") was an attorney licensed to practice law in the State of New Jersey.

    b. Defendant MUHAMMAD SUBPUNALLAH, a/k/a "Mu," ("SUBPUNALLAH") was an inmate at the Essex County Correctional Facility ("Essex County Jail") and then the Hudson County Correctional Facility ("Hudson County Jail"). SUBPUNALLAH was charged by federal criminal complaint with the illegal possession of a firearm, in violation of Title 18, United States Code, Section 922(g).

    c. Defendant VLADIMIR SAUZERESETEO ("SAUZERESETEO") was SUBPUNALLAH's brother.

    d. The Essex County Jail and the Hudson County Jail were facilities in New Jersey that each held federal pretrial detainees by direction of or pursuant to a contract or agreement with the United States Attorney General.

    e. There was a cooperating witness ("CW-1") incarcerated at Essex County Jail. CW-1 has cooperated with law enforcement in the hopes of obtaining a more favorable outcome with respect to federal criminal charges.

    f. There was a second cooperating witness ("CW-2"). CW-2 has cooperated with law enforcement in the hopes of obtaining a more favorable outcome with respect to federal criminal charges.

    g. SUBPUNALLAH, CW-1, and CW-2 were not represented by KAPALIN with respect to their pending federal criminal matters.

    h. Inmates at the Essex County Jail and Hudson County Jail were permitted to place phone calls from phones inside the Jail. The inmates were advised via an automated message at the beginning of every call that the call could be recorded. Accordingly, inmates who proceeded with

3

telephone calls were deemed to have consented to the recording of those calls.

### January 2014 Delivery of Contraband

2. On January 6, 2014, at 5:10 PM, SAUZERESETEO and CW-2 spoke over the telephone. The call was consensually recorded. SAUZERESETEO was asked by CW-2 about the price for "a couple buglers[1] and two ounces of weed,"[2] a common reference to marijuana. SAUZERESETEO said: "I need to call to see how much he gonna charge for the two ounces [of weed]." SAUZERESETEO also told CW-2 that he had talked to Unc, or KAPALIN, and "he [KAPALIN] said "he was going to see" CW-1.

3. On January 6, 2014, at 6:44 PM, SAUZERESETEO sent CW-2 a text message that said: "650 for 2." CW-2 replied: "Perfect." According to CW-2, SAUZERESETEO was quoting CW-2 a price of 650 dollars for 2 ounces of marijuana. According to telephone toll records, at 7:23 PM, a cellular telephone utilized by KAPALIN (the "Kapalin Phone") and a cellular telephone utilized by SAUZERESETEO (the "Sauzereseteo Phone") were in contact with each other and then exchanged 1 text message.

4. On January 7, 2014, at 3:45 PM, SUBPUNALLAH, KAPALIN, and CW-2 spoke over the phone and discussed KAPALIN delivering contraband to CW-1. The call was recorded by the Hudson County Jail recording system. SUBPUNALLAH told KAPALIN that he had a "friend" who needed KAPALIN's "assistance." SUBPUNALLAH said: "I was wondering if you were going to be able to assist him with a case." KAPALIN replied: "I'll have to see, I have to, I have to meet him." SUBPUNALLAH then told KAPALIN that his friend was a "good guy, a close friend of mind, a good guy."

5. Later on January 7, 2014, SUBPUNALLAH spoke with SAUZERESETEO. The call was recorded by the Hudson County Jail recording system. SUBPUNALLAH told SAUZERESETEO that he had just spoken with "Unc." SUBPUNALLAH further stated: "He [KAPALIN] said everything good with that, everything good with that, his whole thing was he wanted to, you know he wanted to meet him first, I let him know you know what I'm saying that's my, that's a good friend, you know what I'm saying, a very good friend, close friend." SAUZERESETEO replied: "I told him [KAPALIN] he [CW-1] was a good friend of mine and a good friend of yours."

6. On January 9, 2014, at 4:20 PM, SUBPUNALLAH spoke with CW-2 over the phone. The call was recorded by the Hudson County Jail recording system. SUBPUNALLAH asked CW-2 about the "money." CW-2 told SUBPUNALLAH: "we were gonna send him a G [$1,000] and then send him another 650 [dollars] to get 2 ounces." SUBPUNALLAH replied: "650, okay. Umm – yea, that should be no problem."

---

[1] Bugler is the name of a roll-your-own brand of tobacco – each Bugler pack comes with a pouch of tobacco and papers in which to roll the tobacco.
[2] Text messages in this Affidavit sometimes contain capitalization, spelling, and grammatical errors. Such messages are quoted in this Affidavit as originally transmitted.

7. On January 13, 2014, at 2:25 PM, SAUZERESETEO received a text message from CW-2 referring to two payments sent via Western Union, stating: "Everything was sent! $825 confirmation #7180529917 $825 confirmation # 5882604590 Call me when you pick it up. Thanks!" SAUZERESETEO replied to CW-2, via a text message, that he would "do it after work."

8. On January 13, 2014, SAUZERESETEO and CW-2 spoke by telephone. This call was not recorded. According to CW-2, SAUZERESETEO informed CW-2 that he had picked up the first Western Union payment and was filling out the paperwork for the second payment to be made in connection with smuggling marijuana, through KAPALIN, into the Essex County Jail. SAUZERESETEO also told CW-2 that KAPALIN was going to call SAUZERESETEO the following day to set up a meeting. Western Union records confirm that SAUZERESETEO picked up two $825 Western Union payments on January 13, 2014.

9. On January 14, 2014, according to telephone toll records, the Kapalin Phone and the Sauzereseteo Phone exchanged 2 text messages and had 1 phone call.

10. On January 15, 2014, SAUZERESETEO and CW-2 spoke by telephone. This call was not recorded. According to CW-2, SAUZERESETEO informed CW-2 that he had spoken to KAPALIN. SAUZERESETEO told CW-2 that he and KAPALIN were planning to meet on Thursday [January 16th] night so that he could deliver the package of marijuana to KAPALIN, for delivery by KAPALIN to CW-1 inside Essex County Jail.

11. On January 16, 2014, according to telephone toll records, between 7:47 PM and 8:41 PM, the Kapalin Phone and the Sauzereseteo Phone exchanged 9 text messages. Then, at 8:49 PM, SAUZERESETEO sent a text message to CW-2 stating: "how are you doing tonight my uncle [KAPALIN] just picked up the paperwork [package of contraband] he's going to see jay on Monday." CW-2 replied: "OK sounds good. Thx." At 9:03 PM, SAUZERESETEO and KAPALIN exchanged 2 more text messages.

12. On January 18, 2014, SUBPUNALLAH and SAUZERESETEO spoke over the telephone. The call was recorded by the Hudson County Jail recording system. Referring to KAPALIN's receipt of the package of contraband, SAUZERESETEO told SUBPUNALLAH: "He got it."

13. On January 23, 2014, according to telephone toll records, there was a phone call between the Sauzereseteo Phone and the Kapalin Phone that lasted for approximately 30 seconds.

14. According to CW-1, on January 24, 2014, KAPALIN met with CW-1 in an attorney visit room located inside the Essex County Jail. KAPALIN told CW-1 that KAPALIN wanted to meet with CW-1 first, prior to bringing in the package of contraband. KAPALIN also informed CW-1 that KAPALIN would return to deliver the package of contraband on Saturday or Sunday (January 25 or January 26, 2014). KAPALIN further indicated to CW-1 that KAPALIN had just delivered another package of contraband to an inmate in the Essex County Jail.

15. The attorney sign-in book at the Essex County Jail confirmed that KAPALIN visited the Essex County Jail on January 24, 2014. Additionally, video surveillance cameras within and outside the Essex County Jail, for January 24, 2014, show: (i) KAPALIN entering the parking lot in his vehicle; (ii) KAPALIN entering the Essex County Jail and passing through a metal detector; (iii) KAPALIN entering an attorney visit room; (iv) CW-1 entering the same attorney visit room; (v) KAPALIN and CW-1 exiting the attorney visit room together; and (vi) KAPALIN exiting the Essex County Jail and subsequently exiting the parking lot in his vehicle.

16. According to CW-1, on January 26, 2014, KAPALIN again met with CW-1 in an attorney visit room located inside the Essex County Jail. During that meeting, KAPALIN handed CW-1 a package. KAPALIN agreed to "deal" directly with CW-1 in the future. However, KAPALIN indicated that he did not want to bring in tobacco anymore; rather, he would only bring in marijuana and other drugs. Finally, KAPALIN agreed to take $1,000 for each package that KAPALIN delivered to CW-1.

17. The attorney sign-in book at the Essex County Jail confirmed that KAPALIN visited the Essex County Jail on January 26, 2014. Additionally, video surveillance cameras within and outside the Essex County Jail, for January 26, 2014, show: (i) KAPALIN entering the Essex County Jail and passing through a metal detector; (ii) KAPALIN entering an attorney visit room; (iii) CW-1 entering the same attorney visit room; (iv) KAPALIN and CW-1 exiting the attorney visit room together and (v) KAPALIN exiting the Essex County Jail and subsequently exiting the parking lot in his vehicle.

18. On January 26, 2014, CW-1 gave the package that he had received from KAPALIN to law enforcement. Law enforcement determined that the package consisted of a white t-shirt containing (1) three vacuum-sealed packages of a green leafy substance along with matches and rolling papers; and (2) two seran-wrapped packages of tobacco and rolling papers. The green leafy substance was field-tested and determined to be marijuana.

19. On January 27, 2014, according to telephone toll records, there was a phone call between the Sauzereseteo Phone and the Kapalin Phone that lasted for approximately 2 minutes.

20. On February 3, 2014, SUBPUNALLAH and CW-2 spoke by telephone. The call was recorded by the Hudson County Jail recording system. SUBPUNALLAH and CW-2 discussed KAPALIN's delivery of contraband to CW-1. SUBPUNALLAH was upset because SUBPUNALLAH said that SAUZERESETEO had paid KAPALIN $1,000 each for two separate deliveries of contraband packages. KAPALIN had indicated to SAUZERESETEO and SUBPUNALLAH that he had given both packages of contraband to CW-1 on January 26, 2014. CW-2 told SUBPUNALLAH that CW-1 only had received one package from KAPALIN. SUBPUNALLAH told CW-2: "Right now I'm losing $1,000." SUBPUNALLAH asked CW-2 to give KAPALIN cigarettes on SUBPUNALLAH's behalf. SUBPUNALLAH indicated that he wanted KAPALIN to give the cigarettes to another inmate in the Essex County Jail so that the other inmate could sell the cigarettes and earn back SUBPUNALLAH'S $1,000. SUBPUNALLAH then told CW-2 that KAPALIN had made mistakes in the past: "One time Unc made a mistake and gave my things [contraband packages] to someone else."

**September and October 2013 Discussions**

       21.    Earlier contacts among SUBPUNALLAH, KAPALIN, SAUZERESETEO, CW-1, and CW-2 provide further evidence of this conspiracy to smuggle contraband into the Essex County Jail. According to CW-1 and CW-2, in or about September 2013, SUBPUNALLAH asked CW-1 if CW-1 could ask CW-2 to pass messages to KAPALIN on SUBPUNALLAH's behalf. CW-1 enlisted CW-2 to pass the messages. On behalf of SUPUNALLAH, CW-2 sent numerous text messages to KAPALIN in September and October 2013 concerning the delivery of contraband, by KAPALIN, to SUBPUNALLAH, inside the Essex County Jail. Examples of some of the text messages are set forth below:

    a.    On October 8, 2013, at 4:07 PM, KAPALIN received a text message from CW-2, on behalf of SUBPUNALLAH, stating: "Mu said you need to bring all the paperwork. He has only ½ the case. He can't work like this. He will pay you more money but, he needs it ASAP!! Please advise when you can get him this." CW-1 confirmed that KAPALIN delivered marijuana and certain pharmaceutical pills to SUUBPUNALLAH, but that KAPALIN only delivered half of the amount that he was supposed to bring. Accordingly, SUBPUNALLAH's prior reference to "1/2 the case" was a code word for "1/2 the package of contraband."

    b.    On October 13, 2013, at 9:15 PM, SAUZERESETEO received a text message from CW-2, on behalf of SUBPUNALLAH, stating: "This is MU Go get the rest of this money and give it to Unc [KAPALIN] ... The whole thing and tell him to bring the rest of that paperwork ASAP because I have a whole new case I need him to work on." The text message then provided a name and a ten-digit number. The investigation has revealed that the ten-digit number contained within the text message was a Western Union confirmation number. In this text message, MU was advising SAUZERESETEO to pick up a Western Union money order and to give the money to KAPALIN so that KAPALIN could begin working on a new "case," or delivery of contraband.

    c.    On October 16, 2013, at 1:35 PM, KAPALIN received a text message from CW-2, on behalf of SUBPUNALLAH, stating: "Listen we has a talk a few weeks back about those other people/clients you were working with. We agreed that if I paid you more money, as well as for precautionary reasons you weren't dealing with those other cases because it was a conflict of interest. So I just want to know if our agreement still stands because there is a lot of talk about you still putting in motion for those other people. I have a brand new case I need you to focas on and I am prepared to pay more money but I don't need you working on any other cases at the same time as mine. Please text back ASAP am let me know what's going on because The way I hear it these guys are waiting on your motion to go through any day now!!" In this conversation, SUBPUNALLAH corresponded with KAPALIN about a prior agreement whereby KAPALIN would cease delivering contraband for other inmates

   and – for more money – would deliver contraband solely for SUBPUNALLAH, according to CW-1.

d. Later, on October 16, 2013, at 2:17 PM, KAPALIN received a text message from CW-2, on behalf of SUBPUNALLAH, stating: "Please let me know that you received this text." At 2:23 PM, KAPALIN replied: "Yes." At 2:32 PM, KAPALIN received another text message from CW-2, on behalf of SUBPUNALLAH, stating: "Does the agreement still stand?" At 2:33 PM, KAPALIN replied: "Yes."